# IMPORTANT NOTICE
# NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: AUGUST 20, 2020
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

## 2019-SC-000270-MR

CLAYTON LOCKABY          APPELLANT

V.          ON APPEAL FROM LAUREL CIRCUIT COURT
HONORABLE MICHAEL O. CAPERTON, JUDGE
NO. 18-CR-00148

COMMONWEALTH OF KENTUCKY          APPELLEE

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

Following a one-day trial in 2019, jurors convicted Clayton Boyd Lockaby of two counts of first-degree sodomy, victim under twelve, and acquitted him of one count of first-degree sexual abuse, victim under twelve. The Laurel Circuit Court imposed two life sentences as jurors recommended, ordering them to be served concurrently.[1] Lockaby appeals as a matter of right claiming an unduly prejudicial portion of his confession should have been redacted; he was denied a unanimous verdict by an instruction inadequately distinguishing two counts of sodomy; and, jurors should have been admonished when the victim testified

---

[1] The jury recommended the two life sentences be served consecutively.

1

Lockaby had sexual contact with her "my whole life." Having reviewed the record, briefs, and arguments, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

Lockaby was charged in a twenty-count indictment with ten counts of first-degree sexual abuse and ten counts of first-degree sodomy, all with a victim under the age of twelve between the summer of 2011 and the fall of 2013. Prior to trial, the Commonwealth dismissed seventeen counts, leaving two counts of sodomy and one count of sexual abuse from 2012 to be tried.

In all counts, the victim was a minor female related to Lockaby we will call "Connie."[2] At the age of twelve in 2017, Connie disclosed to her mother Lockaby had sexual contact with her. Her mother took Connie to the doctor where she was examined, diagnosed with a urinary tract infection ("UTI"), and prescribed medicine.

Soon after disclosing to her mother, Connie made various revelations to a social worker, launching an investigation of Lockaby. When interviewed by the social worker, Lockaby learned the nature of Connie's accusations against him. He was then interviewed by Kentucky State Police Detective Jesse Armstrong. After initially denying any wrongdoing, Lockaby admitted touching and sodomizing Connie multiple times over a course of years. However, he

---

[2] To protect the minor female victim's identity, we have elected not to reference her actual name or relationship to Lockaby.

vehemently denied ever ejaculating into a baggie and having Connie taste his semen.

During opening statement, the Commonwealth said Connie would testify about three occasions on which Lockaby abused her in 2012—he touched her; he performed oral sex on her; and, he made her perform oral sex on him. The Commonwealth also indicated the entire audio interview in which Lockaby confessed to sexually abusing and sodomizing Connie would be played at trial.

Defense counsel's opening statement presented a different story. She stated this was Lockaby's first encounter with the law; his admissions to Det. Armstrong were lies; Lockaby knew Connie had accused him of having sexual contact with Connie before he spoke with Det. Armstrong; he believed he was going to prison no matter what he said; and, Lockaby thought he would receive leniency if he confessed.

At trial, Connie was a thirteen-year-old eighth grader. She described incidents occurring on three separate days in her direct testimony, but gave no specific dates. She testified the count of first-degree sexual abuse happened in 2012 when she was a first grader, about six years old, and living with her family and Lockaby in his trailer. Lockaby was acquitted of this charge and it requires no further discussion.

The two remaining counts—both charged as first-degree sodomy, victim under twelve—occurred when Connie was visiting her aunt's home, where Lockaby would appear and remain for lengthy periods of time. Connie testified her aunt and uncle worked at night and would leave for work in the evening.

About 10:00 or 11:00 p.m., Lockaby would take Connie across the road to a dilapidated house where there were two mattresses stacked atop one another and condoms. At the old house, Connie and Lockaby would "get situated" and he would make her do "stuff" to him. Twenty to thirty minutes later, Lockaby would remove Connie's pants—leaving her in a shirt—put her legs over his shoulders and put his mouth on her vagina. Connie said she and Lockaby often stayed at the old house "half the night" and would return to her aunt's home early the next morning. Connie stated she never spent the entire night in the old house.

After providing a general description of the old house and what transpired inside, Connie testified about two separate acts of first-degree sodomy. The first occurred in the fall of 2012 when it was cool outside, and she was in first or second grade. Connie testified she had gone to bed around 9:00 p.m., Lockaby awoke her, and she accompanied him to the old house. She was cold, asked for a blanket, and Lockaby gave her one riddled with holes. Lockaby removed her pants, put her legs over his shoulders, and put his mouth on her vagina. She then put her mouth on his penis. Connie and Lockaby returned to her aunt's home around 1:00 or 2:00 a.m.

Connie testified the other charge of first-degree sodomy occurred on a Sunday in the summer of 2012. It was warm outside, she was at her aunt's home, and she was about five or six years old. Connie recalled she wore shorts, played in her aunt's pool, had water balloon fights, and played with the dog. Lockaby arrived and stayed the remainder of the day. Connie testified

4

Lockaby waited until all were asleep that night, awakened her, and took her to the old house where he became "real calm" and started undressing. Connie also undressed. Lockaby made her place her mouth on his penis. He then put his mouth on her privates. For the first time, Lockaby made her sit on top of him near his penis and move. Lockaby also "came inside" a condom and "started explaining to [her] what everything is." Around 2:00 a.m., Lockaby took Connie back to her aunt's home. Connie confirmed these activities transpired during the event which occurred the night of the water balloon fights.

Connie testified Lockaby made her put her mouth on his privates many times. Within a two-minute span she said, "it happened all the time," "it was every time," and, "I can't even remember when it started it's been going on so long." None of these statements drew a defense objection. Ten minutes later, the Commonwealth asked Connie its last question on direct examination—whether the three instances she had described were the only times sexual activity with Lockaby had occurred. Connie answered, "No, it's happened my whole life. I can't even remember when it started. He'd come up wanting to take me to Dollywood. . . ." At that point, defense counsel objected under KRE[3] 404(b), arguing Connie "could not just say it happened all the time" because jurors were deciding three specific charges, not a series of unspecified acts. During the bench conference, the trial court offered an admonition that was

---

[3] Kentucky Rules of Evidence.

5

never given. However, as defense counsel argued, the purpose of her objection was to terminate Connie's testimony about recurring acts. The trial court overruled the objection, but the Commonwealth had already ended its direct examination of Connie, thereby achieving defense counsel's goal.

Connie's aunt was called by the Commonwealth. She confirmed her in-law's dilapidated and vacant homeplace is located across the road from the home she shares with her family in Laurel County. She described the old house as being in "rough" condition, and empty, without any mattresses. Connie's aunt said she worked third shift at the cookie factory from "10:00 to 6:00," but also admitted she was in Drug Court in 2011-2012 and had a 10:00 p.m. curfew, with no work exemption. She further stated she has three adult children and someone was always home and awake. She did not recall Lockaby ever being alone with Connie in her home, but admitted she could not say what happened when she was not home.

Connie's aunt remembered the kids having water balloon fights at her home one summer day in 2012, but was unsure of the date. She said Connie was probably at the pool that day. Though initially unsure if Lockaby was present, she later testified she was "99 percent certain" Lockaby's back had gone out while he was in the pool that day, and he left before dark when his back pain eased.

The Commonwealth ended its case-in-chief with Det. Armstrong who introduced Lockaby's nearly forty-eight-minute interview. Without defense objection, the Commonwealth began playing the audio recording for the jury.

6

Det. Armstrong confirmed Lockaby had been interviewed previously by a social worker and seemed to know the purpose of his visit. Det. Armstrong told Lockaby he could stop the interview at any time.

Lockaby began the interview by saying Connie's mother falsely accuses him when he upsets her, and he believed she had put Connie up to making the sexual allegations against him. Later, Lockaby admitted touching and sodomizing Connie. He estimated it happened six to eight times over three to four years, but claimed he had not touched her since her ninth birthday. Lockaby also admitted putting his mouth on Connie's vagina and having Connie put her mouth on his penis.

When Det. Armstrong was heard on the interview tape asking Lockaby whether he had ever asked Connie to do "anything that I would call weird, or odd or out of the ordinary," defense counsel objected and approached the bench. Lockaby was about to vehemently deny ever ejaculating into a baggie and having Connie taste his semen. Defense counsel argued this portion of the interview was unduly prejudicial, concerned an uncharged accusation, and should be redacted. The objection was overruled and the entire interview was played.

Lockaby testified in his own defense. He asserted Connie's mother had disclosed to him her step-grandfather had molested her as a child, an occurrence confirmed to Lockaby by Connie's great grandmother. He testified Connie's mother had threatened him, and noted the accusations Connie made

against him mirrored the claims Connie's mother had previously made against her step-grandfather.

Lockaby denied ever touching Connie inappropriately. He admitted going to the dilapidated house twice to strip copper, but for no other reason and never with Connie. He recalled no water balloon fights, but did remember his back seizing one day while at the pool, after which family members helped him to his car and he drove home.

Lockaby testified he had assumed he was going to prison because Det. Armstrong indicated he believed Connie's accusations. Lockaby explained he had lied during the police interview because he thought by confessing he was doing himself a "favor." Lockaby explained his thought process:

> What would you do with a little kid? What would you do—besides rape 'em and murder 'em—and the only thing you could do is touch 'em. If you penetrated 'em or anything, they're damaged for life, so I would just tell him that I did little things like that . . . to try to get some pity—I'll put it that way—and it backfired on me.

When defense counsel asked why he admitted some actions but vigorously denied the "semen in the condom," Lockaby responded, "because that is so despicable." He also noted Connie's reference to "semen" mirrored her mother's terminology.

On cross-examination, Lockaby proceeded to express his belief Connie's mother had encouraged Connie to make false accusations against him—a view he repeated on redirect. He also reiterated he confessed to Det. Armstrong in a misguided attempt to minimize punishment.

Prior to submission of the case to the jury, defense counsel urged the trial court to include language about "water balloon fights" in Instruction No. 4 (summer of 2012 sodomy) as a means of differentiating the warm night on which that crime occurred. Instead, the trial court's instruction referenced the crime as having occurred "while it was warm outside, and [Connie] did not request a blanket." In contrast, Instruction No. 5 (fall of 2012 sodomy) said that crime occurred "while it was cool outside, and [Connie] requested a blanket." Defense counsel maintained the language inadequately separated the two acts and would deny Lockaby a unanimous verdict.

On appeal, Lockaby alleges three errors require his sentence be vacated. We disagree and affirm.

## ANALYSIS

### I. Redaction of Recorded Interview

First, Lockaby argues the trial court erred in not requiring redaction of a portion of his recorded interview with Det. Armstrong beginning at the point Lockaby was asked whether he had done anything "weird, or odd, or out of the ordinary" with Connie. In the interview, Lockaby initially responded by referencing possible alcohol or drug use, but when Det. Armstrong pointedly asked if he had ever ejaculated and urged Connie to taste his semen, he vehemently denied doing so.

Both the Commonwealth and the trial court initially thought defense counsel was objecting under KRE 404(b)—pertaining to "[o]ther crimes, wrongs, or acts"—until she clarified she was seeking relief under KRE 403, which reads:

9

> [a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

In support of her objection, defense counsel argued the specific accusation that Lockaby ejaculated into a baggie and had Connie taste his semen was never charged as a crime; was more prejudicial than probative; and was highly inflammatory. Specifically, she asserted the conduct—which Lockaby vigorously denied—was "so inflaming to the average person" it would sway jurors to convict him.

The Commonwealth disagreed. It noted during opening statement defense counsel had told jurors Lockaby's confession resulted from Det. Armstrong's pressure tactics; she portrayed Lockaby's taped confession was a lie told to curry favor because he believed he was going to prison; and, he had seen confessions result in lighter sentences on television. The Commonwealth argued Lockaby's adamant denial of ejaculating and offering his semen to Connie, after having confessed to sodomizing and sexually abusing her multiple times over several years, demonstrated he could distinguish truth from fiction and had not been pressured into confessing. While agreeing the conduct Lockaby had so ardently denied was "disgusting," the Commonwealth argued it was no worse than the sex crimes he had admitted during the interview and for which he was standing trial.

Moreover, the Commonwealth noted Connie's interview with the social worker—wherein Connie indicated Lockaby had her taste his semen after

10

ejaculating—was not played to the jury. Thus, jurors never heard Connie make the accusation; they only heard Det. Armstrong ask Lockaby whether he had committed the act, and then Lockaby's vigorous denial. As a result, the Commonwealth argued defense counsel's concern regarding any prejudicial or inflammatory impact of that portion of the taped interview was overstated. Defense counsel, however, maintained any probative value was heavily outweighed by the undue prejudice it would cause.

The trial court rejected defense counsel's arguments and overruled her objection. It found Lockaby's strenuous denial vis-à-vis his admission he committed the charged crimes demonstrated his ability to differentiate truth from lies. It also found this dichotomy showed "his will to disavow certain statements" was not overwhelmed by Det. Armstrong's allegedly aggressive interrogation.

We review evidentiary rulings for an abuse of discretion. *King v. Commonwealth*, 554 S.W.3d 343, 358 (Ky. 2018) (citing *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky. 2000)). The test is whether the ruling "was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). In evaluating the ruling, we consider the proof in the light most favorable to the proponent—here, the Commonwealth—giving the words "its maximum reasonable probative force and its minimum reasonable prejudicial value." *Major v. Commonwealth*, 177 S.W.3d 700, 707 (Ky. 2005). Finally, in "determining the admissibility of other crimes [or acts] evidence[]" we consider

11

its "relevance, probativeness, and prejudice." *Southworth v. Commonwealth*, 435 S.W.3d 32, 49 (Ky. 2014) (citing Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 2.25(II) (3d ed.1993)) (brackets in original).

When applying KRE 403, a trial court balances "three factors: the probative worth of the evidence, the probability that the evidence will cause undue prejudice, and whether the harmful effects substantially outweigh the probative worth." *Yates v. Commonwealth*, 430 S.W.3d 883, 897 (Ky. 2014) (citing *Barnett v. Commonwealth*, 979 S.W.2d 98, 100 (Ky. 1998)). Exclusion is appropriate "[w]hen the possibility of undue prejudice outweighs the probative worth of the evidence presented[.]" *Id.* at 897.

Relevant evidence tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. Irrelevant evidence is inadmissible. KRE 402.

Based on the foregoing legal authority, we hold Lockaby's entire interview was relevant, probative and not unduly prejudicial. His staunch denial of ejaculating into a baggie and having Connie taste his semen stood in stark contrast to his admission of other sex crimes. These vastly different responses established he was willing and able to admit some, but not all, of Connie's allegations. It also negated any reasonable notion Det. Armstrong had pressured him into confessing. Without this single vigorous denial, Lockaby's claim of breaking under police pressure and lying to receive a lighter sentence

12

may have been more plausible. However, we hold the subject matter was probative and relevant to the jury's deliberations.

While Det. Armstrong's asking Lockaby whether he had ejaculated and urged Connie to taste his semen did not paint Lockaby in a positive light, neither did his own admission of sodomizing Connie on multiple occasions. Without objection, Connie testified Lockaby "came inside" a condom and began "explaining . . . everything" to her at the old house the night of the sodomy act linked to the summer of 2012. Because defense counsel did not object to Connie's testimony regarding Lockaby's ejaculation and sexual explanation, the purpose of her objection must have been to prevent the jury from hearing any accusation by Connie that Lockaby had her taste his semen. Though overruled, defense counsel's timely objection achieved its purpose.

Contrary to Lockaby's argument, we hold the trial court properly balanced the evidence and determined Lockaby's vigorous denial was neither unduly prejudicial nor overly inflammatory. We discern no abuse of discretion and no error.

## II. Unanimous Verdict

Second, Lockaby argues he was denied a unanimous verdict by the absence of a unique identifier in Instruction No. 4 to ensure all jurors convicted him of the same crime. He correctly asserts criminal conviction by a jury requires a unanimous verdict. *Cannon v. Commonwealth*, 291 Ky. 50, 163 S.W.2d 15, 16 (1942) (interpreting Section 7 of Kentucky Constitution). He then cites *Ruiz v. Commonwealth*, 471 S.W.3d 675, 678 (Ky. 2015) to maintain

13

Instruction No. 4 had to mention "water balloon fights" because Connie testified fights occurred in the afternoon prior to Lockaby sodomizing her on the summer night in 2012.

We review alleged instructional errors for an abuse of discretion. *Sargent v. Shaffer*, 467 S.W.3d 198, 203 (Ky. 2015). While alleging a specific date is one way to pinpoint a particular crime, a child sexual abuse victim often cannot, and indeed need not, specify the date on which a particular offense occurred. It is enough if the child can provide a "distinct factual basis for each separate charge" from which jurors may "determine in each instance whether a separate criminal offense had been committed." *Miller v. Commonwealth*, 77 S.W.3d 566, 576 (Ky. 2002) (citations omitted).

Connie could not provide specific dates, but she did give compelling detailed descriptions of two separate acts of sodomy.

> As this Court has stated on many occasions, we follow the bare-bones principle in jury instructions. *See, e.g., Harp v. Commonwealth*, 266 S.W.3d 813, 819 (Ky. 2008). "[J]ury instructions should tell the jury what it must believe from the evidence in order to resolve each dispositive factual issue while still 'providing enough information to a jury to make it aware of the respective legal duties of the parties.'" *Id.* (quoting *Olfice, Inc. v. Wilkey*, 173 S.W.3d 226, 229 (Ky. 2005)). "In criminal cases, instructions 'should conform to the language of the statute,' and '[i]t is left to the lawyers to "flesh out" the "bare bones" in closing argument.'" *Wright v. Commonwealth*, 391 S.W.3d 743, 746-47 (Ky. 2012) (quoting *Parks v. Commonwealth*, 192 S.W.3d 318, 326 (Ky. 2006)).

*Crabtree v. Commonwealth*, 455 S.W.3d 390, 413 (Ky. 2014).

14

Instructions must conform to both the applicable statute, *McGuire v. Commonwealth*, 885 S.W.2d 931, 936 (Ky. 1994), and the indictment. *Hunter v. Commonwealth*, 239 S.W.2d 993 (Ky. 1951). Here, KRS[4] 510.070(1)(b)(2) specifies a person commits first-degree sodomy by engaging in deviate sexual intercourse with a person who cannot validly consent because she is under the age of twelve. Thus, for a child victim, the statute has two elements—deviate sexual intercourse and the victim's age. Further, Count 10 of the indictment alleged:

> . . . on or about Summer of 2012 in Laurel County, Kentucky, the above named [sic] defendant, acting alone or in concert with others committed the offense of Sodomy in the first Degree by engaging in deviate sexual intercourse with [Connie] through the use of forcible compulsion on a child under the age of 12 years old[.]

Thus, the indictment sets forth the "Summer of 2012" as the distinguishing element of this specific act. Contrary to Lockaby's argument, water balloon fights are neither set forth as a required element under the applicable criminal statute nor referenced within the indictment. As such, no mention of "water balloon fights" in Instruction No. 4 was required. Moreover, the Commonwealth proved both statutory elements occurred on the warm summer night in 2012.

As argued by the Commonwealth, mentioning "water balloon fights" in the instruction would have added an element jurors did not have to believe to

---

4 Kentucky Revised Statutes.

15

convict. Lockaby's defense was not, "I did not sodomize Connie the day of the water balloon fights," it was, "I never sodomized Connie." Jurors could have disbelieved water balloon fights occurred but believed Lockaby sodomized Connie in the summer of 2012. In conformity with *Crabtree*, it was proper for the trial court to provide a bare-bones instruction and allow counsel to "flesh out" the specifics during closing argument.

Additionally, Lockaby's reliance on *Ruiz* as requiring reversal is misplaced. In *Ruiz*, a failure of proof resulted in flawed instructions and denial of a unanimous verdict. Ruiz was charged with three counts each of first-degree sexual abuse and first-degree sodomy. The victim, Ruiz's six-year-old stepdaughter, testified at trial but did not "isolate and identify any individual episode of sexual abuse or sodomy that would relate the specific crime to the instructions to be given to the jury." *Ruiz*, 471 S.W.3d at 679. Instead, the child

> testified that on many occasions within the five-month period, [Ruiz] took her into his bedroom and subjected her to various forms of sexual contact, including anal sodomy, forcing her to perform oral sodomy on him, and forcing her to touch his penis.

*Id.* at 677. When the instructions were prepared, drawn from the child's generalized testimony about "multiple indistinguishable instances of sexual abuse and . . . sodomy," *id.* at 678, there were

> no distinguishing descriptions that would fairly apprise the jury of exactly which criminal episode it was charged to consider. Without an instruction to channel the jury's deliberation, the jury was left to

16

adjudicate guilt on any or all of the vaguely alleged
incidents, resulting in a verdict of doubtful unanimity.

*Ruiz*, 471 S.W.3d at 679. As a result, in *Ruiz*, there was "no assurance that each of the jurors were focused upon the same occurrence when they cast their respective guilty votes." *Id.* at 678. Although unpreserved, this Court deemed the flawed instructions and resulting denial of a unanimous verdict "jurisprudentially intolerable." *Id.* at 679. Thus, the conviction was reversed and remanded for a new trial on multiple grounds.

Lockaby's case is distinguishable from *Ruiz*. It does not suffer from the same defect. Connie's testimony was not general, it was specific and detailed, alleging distinct crimes on separate days, peppered with unique facts about each. In constructing the separate instructions for Connie's two sodomy allegations, the trial court included adequate details from which the jury could reasonably distinguish the crimes. A full litany of distinguishing facts need not be incorporated into a jury instruction, nor must a particular fact urged by the defense be included. *Ruiz* merely requires each instruction to provide jurors a reasonable means of delineating one crime from another when multiple crimes are charged. As noted in *Ruiz*, the potential for a nonunanimous verdict occurs only when the proof "equally suggests the commission of two or more similar crimes[.]" *Id.* at 678.

Unlike the facts of *Ruiz*, there could be no confusion between Instructions No. 4 (summer of 2012) and No. 5 (fall of 2012) in the present case. Regarding the former, Connie referenced many occurrences on that

17

summer day in addition to water balloon fights, including: while at her aunt's house she played in the pool; she wore shorts; it was warm outside; she played with the dog; Lockaby "came inside" a condom and started explaining things to her; and, for the first time, Lockaby made her sit on top of him. Based on Connie's testimony, Instruction No. 4 read, in pertinent part,

> [Lockaby] engaged in sexual intercourse with [Connie] while it was warm outside, and she did not request a blanket.

Regarding the latter, Connie described the temperature as being "kinda cool," and recalled asking for a blanket when Lockaby took her to the old house and him giving her a blanket full of holes. She also recalled having worn blue jeans that day with slip-on shoes, a shirt, and vest. In fact, a photo of her wearing that outfit was introduced as Commonwealth's Exhibit 2. Based on Connie's testimony, Instruction No. 5 read, in pertinent part,

> [Lockaby] engaged in deviate sexual intercourse with [Connie] while it was cool outside, and she requested a blanket.

The trial court's bare-bones, but descriptive, language in Instructions No. 4 and 5 adequately "channel[ed] the jury's deliberation" and distinguished the two acts of sodomy being tried. *Ruiz*, 471 S.W.3d at 679. As expressed in *Miller*, 77 S.W.3d at 576,

> [w]hether the issue is viewed as one of insufficient evidence, or double jeopardy, or denial of a unanimous verdict, when multiple offenses are charged in a single indictment, the Commonwealth must introduce evidence sufficient to prove each offense and to differentiate each count from the others, and the jury must be separately instructed on each charged offense.

18

We hold Lockaby was convicted by a unanimous jury of the two separate charges of sodomy in conformity with the above-quoted directive. There is no basis for reversal.

### III. Impossibility Defense

Third, in addition to arguing lack of a unanimous verdict—the claim preserved by trial defense counsel—on appeal, Lockaby also attacks the trial court's exclusion of any reference to "water balloon fights" from Instruction No. 4 relative to his defense of impossibility. On appeal, Lockaby argues this omission rendered the instruction incomplete and omitted facts "raised by the evidence and material to his defense[.]" *Hayes v. Commonwealth,* 870 S.W.2d 786, 788 (Ky. 1993). Citing "VR: 2/6/19; 4:43-20-4:48:00," he claims the issue is preserved. The Commonwealth concedes sufficiency of Instruction No. 4 was preserved by objection at trial but does not address this particular aspect of Lockaby's argument in its brief. We deem this part of Lockaby's argument relating to Instruction No. 4 to be unpreserved.

At trial, Lockaby never argued the instructions failed to incorporate his defense of impossibility. Instead, defense counsel's sole stated purpose in asking the trial court to include "water balloon fights" in Instruction No. 4 was to ensure juror unanimity—a matter we have previously addressed. We will not entertain a new argument for the first time on appeal. *Knott County Bd. of Educ. v. Patton,* 415 S.W.3d 51, 56 (Ky. 2013) (citations omitted).

19

## IV. Admonishment

Fourth, Lockaby argues the trial court failed to admonish jurors when the Commonwealth asked Connie if the three sex crimes she had described were the only times Lockaby touched her, and Connie had replied that Lockaby's sexual acts had "happened my whole life." Defense counsel had objected, arguing the Commonwealth was eliciting prior bad acts to prove Lockaby was "acting in conformity therewith" and thereby "bolstering" other proof in violation of KRE 404(b). During the ensuing aforementioned bench conference, however, defense counsel explained the basis of her objection, saying:

> I mean, I just want it to be clear to the jury that they're to decide whether these three specific events that we're talking about are what happened and not find him guilty on "Oh, it happened all the time."
>
> . . .
>
> I objected because I thought [the Commonwealth] was asking more questions. I didn't want [Connie] to give any more details, any more evidence, and he is stopping, so.
>
> . . .
>
> And I just want to make myself clear, when I came up to argue, it was "I want her to stop now. Not, I want to strike old things."

At one point during the bench conference, defense counsel accepted the trial court's offer of an admonishment. Following further discussion, however, when the trial court ultimately overruled her objection, defense counsel did not reassert any desire for an admonition, and none was given.

20

Even so, defense counsel obtained her desired relief. Based on defense counsel's explanation, it is clear she simply wanted to end Connie's direct testimony about Lockaby's sexual proclivity. Though her objection was overruled, the Commonwealth had asked its last question of Connie. Therefore, defense counsel received the desired result. We discern no abuse of discretion and therefore, no error.

**CONCLUSION**

For the foregoing reasons, we hereby affirm the judgment of the Laurel Circuit Court.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Emily Holt Rhorer
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Thomas Allen Van De Rostyne
Assistant Attorney General